UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 04-1739
_____

KIRK E. WEBSTER,

Plaintiff - Appellant,

versus

DONALD H. RUMSFELD, Secretary of Defense;
JAMES R. CLAPPER, JR., National Imagery and
Mapping Agency,

Defendants - Appellees.

_____

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.  Roger W. Titus, District Judge. (CA-03-
924-RWT)

_____

Argued:  September 19, 2005          Decided:  December 1, 2005

_____

Before TRAXLER, KING, and GREGORY, Circuit Judges.

_____

Affirmed in part, reversed in part, and remanded by unpublished
opinion.  Judge Traxler wrote the majority opinion, in which Judge
King joined.  Judge Gregory wrote an opinion concurring in part and
dissenting in part.

_____

**ARGUED:** David A. Branch, Washington, D.C., for Appellant.  Tarra R.
DeShields-Minnis, Assistant United States Attorney, OFFICE OF THE
UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellees.  **ON
BRIEF:** Allen F. Loucks, United States Attorney, Baltimore,
Maryland, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

TRAXLER, Circuit Judge:

Kirk E. Webster brought this action against the Secretary of Defense for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, see 42 U.S.C.A. §§ 2000e to 2000e-17 (West 2003), while employed with the National Imagery and Mapping Agency ("NIMA" or "Agency") of the Department of Defense, and for NIMA's alleged breach of a settlement agreement. Prior to discovery, NIMA filed a motion to dismiss or for summary judgment, and the district court granted summary judgment. We affirm in part, reverse in part, and remand.

I.

Webster, an African-American male, was employed by NIMA as a cartographer in 1988 and, beginning in 1993, worked the night shift on the DE Alpha cartography system. In 1997, Webster filed an Equal Employment Opportunity ("EEO") complaint of race discrimination against NIMA, which the parties settled by written agreement. On April 5, 2000, Webster initiated a second EEO complaint against NIMA, alleging that he had been subjected to adverse employment actions during 1999 and 2000 that were motivated by racial discrimination and in retaliation for his prior EEO activity. Webster was a GS-11 level employee at the time.

Pending a hearing before the Administrative Law Judge ("ALJ"), Webster and NIMA engaged in settlement negotiations. In September

3

2001, Webster's counsel sent an e-mail message to NIMA's counsel, purporting to confirm several terms of a settlement agreement between them, including (1) that Webster would receive a retroactive promotion to Pay Band IV (equivalent to GS-13, Step 5) from September 1999 through March 2000, and a retroactive promotion within Pay Bank IV (equivalent to GS-14, Step 1) from March 2000 forward, as well as back pay in a lump-sum amount; (2) that Webster would receive retroactive agency contributions to his Thrift Savings Plan to reflect the back pay and merit increases, and (3) that the Agency would annotate Webster's 2001 performance appraisal to reflect that his position was the equivalent of a Job Lead position. Webster's counsel also advised the ALJ of the settlement negotiations and informed the ALJ that the request for an administrative hearing would be withdrawn subject to final confirmation of the settlement terms. On October 2, 2001, the ALJ dismissed Webster's complaint.

On October 17, 2001, the parties executed a written Settlement Agreement in which NIMA agreed to (1) promote Webster to Pay Band IV, retroactive to September 6, 1999, to include back pay; (2) pay Webster's attorneys fees and costs in the amount of $15,987 directly to counsel within 30 days of the execution of the agreement; (3) pay Webster $10,000 for compensatory damages and $770 for out-of-pocket medical expenses; and (4) restore 40 hours of sick leave and 40 hours of annual leave. In return, Webster

4

agreed to relinquish all pending administrative complaints and waived the right to assert the claims in court. Webster acknowledged and agreed that there were "no other terms, obligations or conditions of this agreement for either party to this agreement, except those expressly stated herein." J.A. 135.

In December 2001, Webster's counsel advised NIMA's counsel that Webster had not received back pay for his promotion to GS-13, Step 5, from September 1999 to March 2000, or for his promotion to the GS-14, Step 1, from March 2000 to the present. Webster asserts that NIMA's EEO Complaint Manager John Sutkowsky advised Webster that he would be promoted to GS-14 effective in the last pay check for the month of December 2001, but later advised Webster (consistent with the written agreement) that NIMA had only agreed to a promotion to Pay Band IV (at GS-13, Step 1).

In January 2002, Webster notified the EEO Director and Sutkowsky that NIMA had breached the settlement agreement by failing to (1) retroactively promote him to GS-13, Step 5, and GS-14, Step 1; (2) make retroactive contributions to his Thrift Savings Plan; (3) annotate his 2001 performance appraisal; and (4) timely pay his attorneys' fees. NIMA admitted that the attorneys' fee payment was technically late because NIMA had erroneously sent the check to Webster instead of Webster's attorney, but denied that it had agreed to the other terms, which had been set forth in Webster's e-mail prior to execution of the written settlement

5

agreement, but not included in the final agreement. With the exception of the attorneys' fee error, NIMA advised Webster that "the settlement terms are clear and unambiguous, and the terms have been executed as promised." J.A. 141.

In March 2002, Webster filed a third EEO complaint, alleging that NIMA had breached the settlement agreement and discriminated against him because of his race and in retaliation for his prior EEO activity. The EEOC Office of Federal Operations held that Webster had not shown a breach of the settlement agreement and agreed with NIMA's rejection of the claim. On November 4, 2002, Webster initiated this action in the United States District Court for the District of Columbia, alleging breach of the settlement agreement, discrimination and retaliation. The case was transferred to the District of Maryland on March 7, 2003.

In the summer and fall of 2002, while Webster's third EEO complaint was pending administrative review, Webster alleges that a number of adverse changes occurred in his employment. Although the cartographers had been advised that the DE Alpha workstations were going to be replaced by IEC workstations during the 2004/2005 fiscal year, the replacement occurred ahead of schedule. By November 2002, the DE Alpha workstations had been replaced in the NIMA East location, Webster had been reassigned to a different branch and office, and was no longer working as a DE Alpha cartographer. By the end of the year, Webster's work role was

formally changed to Geospatial Analyst, a position in which Webster claims he had expressed no interest and had no skills to perform.

Also in the fall of 2002, Webster received a downgraded annual evaluation. Although his performance appraisal was termed "excellent," he was not recommended for promotion to Pay Band V and did not obtain a numerical rating high enough to qualify for a bonus. According to Webster's supervisor, who had recommended Webster for promotion in earlier years, Webster was not recommended in 2002 because he needed to be "more front and center" and "get [himself] out a little more." J.A. 40 (internal quotation marks omitted). According to Webster, the DE Alpha workstations remained in production in NIMA West until February 2004 and cartographers similarly situated to him continued to receive promotions.

In January 2003, Webster filed his fourth EEO complaint, alleging that the changes to his work role, and the subsequent denial of a promotion recommendation and bonus, were due to continued racial discrimination and retaliation. Webster did not participate in the administrative investigation and planned instead to amend his federal complaint to assert these claims.

The year 2003 brought more changes. Webster again received a performance rating of "excellent," as well as a salary increase, but he failed to garner a score sufficient to qualify for a bonus. Webster was also moved from night shift to day shift in August 2003, which resulted in the loss of a pay differential.

As noted above, Webster's complaint was transferred to the Maryland district court in March 2003, but no discovery had taken place. Given Webster's mounting complaints, the parties filed a joint motion to stay discovery and a consent motion for leave to allow Webster to file an amended complaint to assert the additional claims of discrimination and retaliation once the administrative proceedings were exhausted. The motion was granted and Webster filed his amended complaint in November 2003, asserting, in addition to the breach of settlement claim, claims that the change in his job title and duties, his lower performance ratings, his failure to be recommended for promotions and bonuses, and his reassignment from the night shift to the day shift were motivated by racial and retaliatory animus.

In January 2004, NIMA filed a motion to dismiss or, in the alternative, for summary judgment. NIMA's motion was supported by a number of documents, e-mails and affidavits executed by NIMA officials which essentially claimed that the changes to Webster's job were the result of a restructuring that had taken place within NIMA and Webster's subsequent, less-than-stellar job performance.

In response, Webster filed an affidavit setting forth his personal knowledge of the pending claims and a "Certification" averring "under penalty of perjury that pursuant to Rule 56(f) [he could not] present by affidavit or otherwise facts essential to rebut factual assertions made by defendants without engaging in

8

discovery." J.A. 98. Specifically, he asserted a need to depose Sutkowsky, as well as Agency counsel Jack Rickert, to prove "that the Agency agreed to terms other than those set forth in the settlement agreement," and a need to conduct discovery regarding "the circumstances surrounding [his] change from evening shift to day shift and the change in [his] work role, as well as the objective standards for issuing [him] an evaluation in FY 2002 which resulted in denial of promotion recommendation and denial of bonuses in FY 2003 and FY 2004, and how similarly situated co-workers were evaluated." J.A. 98-99.

On April 21, 2004, the district court denied Webster's request to conduct discovery and granted summary judgment to NIMA. The district court ruled that Webster's Rule 56(f) request was deficient because it was labeled a "certification" instead of an "affidavit," was based upon Webster's "knowledge, information, and belief," instead of his "personal knowledge," and lacked the requisite specificity regarding the discovery sought. With regard to the merits, the district court ruled that the breach of settlement claim failed because Webster sought to include terms not included in the executed contract, and that the Title VII claims failed because he had not identified any adverse employment action that had been taken against him. The district court also ruled that Webster had failed to exhaust his claim that the reassignment from night shift to day shift was the result of retaliation.

9

II.

We review the district court's grant of summary judgment de novo, see Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988), construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in his favor, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The standard for granting summary judgment is well-settled.  Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case."  Nguyen v. CNA Corp., 44 F.3d 234, 237 (4th Cir. 1995) (internal quotation marks omitted).  Once he has done so, the nonmoving party "may not rest upon the mere allegations or denials," id. (internal quotation marks omitted), but must "go beyond the pleadings and, by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'  Celotex, 477 U.S. at 324.

As a general rule, however, summary judgment is not appropriate prior to the completion of discovery.  See id. at 322

10

("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, <u>after adequate time for discovery</u> and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (emphasis added)). Rule 56(f) provides the district court with the discretionary authority, in appropriate cases, to deny a premature motion for summary judgment where the nonmoving party demonstrates that he has not had adequate time for discovery or needs additional time to complete it. <u>See</u> Fed. R. Civ. P. 56(f) ("Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just"); <u>see</u> <u>also</u> <u>Celotex</u>, 477 U.S. at 326. Thus, "the non-moving party's duty to respond specifically to a summary judgment motion is expressly qualified by Rule 56(f)'s requirement that summary judgment be refused where the non-moving party has not had the opportunity to 'discover information that is essential to his opposition.'" <u>Strag</u> <u>v. Board of Trustees</u>, 55 F.3d 943, 953 (4th Cir. 1995) (quoting <u>Nguyen</u>, 44 F.3d at 242); <u>see</u> <u>also</u> <u>Anderson</u>, 477 U.S. at 250 n.5 (noting that Rule 56(e) requirement that the nonmoving party come

11

forth with specific facts demonstrating a genuine issue for trial "is qualified by Rule 56(f)'s provision that summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition"); Celotex, 477 U.S. at 326 ("Any potential problem with [a] premature [summary judgment motion] can be adequately dealt with under Rule 56(f), which allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity to make full discovery." (footnote omitted)).

We review a district court's denial of a Rule 56(f) motion for an abuse of discretion. See Nguyen, 44 F.3d at 242. However, "[t]he denial of a Rule 56(f) motion for extension should be affirmed where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Strag, 55 F.3d at 954; see also Anderson, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

III.

With these standards in mind, we begin with Webster's contention that the district court erred in granting summary judgment on his breach of settlement claim and erred in refusing to allow him to conduct discovery into the terms of the settlement.

Settlement agreements are contracts and are therefore governed by general principles of contract law. See Byrum v. Bear Inv. Co., 936 F.2d 173, 175 (4th Cir. 1991). "[W]hen a written contract is clear and unambiguous, it is the duty of the court, not the jury, to determine its meaning." Nehi Bottling Co. v. All-American Bottling Corp., 8 F.3d 157, 161 (4th Cir. 1993). The parties' intent may be "discerned from the four corners of the contract." United States v. Liranzo, 944 F.2d 73, 77 (2d Cir. 1991).

In the instant case, the terms of the settlement agreement are quite specific. NIMA agreed to (1) promote Webster to Pay Band IV, retroactive to September 6, 1999; (2) pay Webster's attorneys' fees and costs directly to counsel within 30 days; (3) pay Webster $10,000 for compensatory damages and $770 for out-of-pocket medical expenses; and (4) restore 40 hours of sick leave and 40 hours of annual leave to him. Webster agreed to relinquish all pending administrative complaints, waived the right to assert these claims in court, and agreed that there were "no other terms, obligations or conditions of this agreement for either party to this agreement, except those expressly stated herein." J.A. 135.

13

With the exception of Webster's claim that NIMA breached the provision that his attorneys' fees be timely paid, however, Webster's claim is <u>not</u> that NIMA breached the terms set forth in the written settlement agreement, but rather that NIMA breached terms that the parties <u>failed</u> to include in the written settlement agreement. These additional terms find their origin in the unilateral e-mail sent by Webster's counsel to NIMA's counsel during the course of the settlement negotiations, prior to execution of the written settlement document.

Webster argues that NIMA acknowledged receipt of the settlement e-mail from Webster's attorney and, thereby, agreed to its terms as well. NIMA, on the other hand, denies that it ever agreed to these terms and asserts that this was communicated to Webster's counsel via a telephone call placed after the e-mail message. From this alleged factual dispute, Webster asserts an entitlement to discovery regarding the "actual" terms of the settlement agreement, specifically the right to depose Rickert and Sutkowsky to demonstrate "that the Agency agreed to terms other than those set forth in the settlement agreement." J.A. 98.

We are unpersuaded. The written contract is clear and unambiguous, does not include the terms from the e-mail message that Webster seeks to enforce, and cannot be varied by extrinsic evidence. We also agree that Webster failed to demonstrate a need for further discovery on this claim. The information Webster seeks

14

to establish via the requested depositions is not relevant or necessary to the resolution of his breach of contract claim, and would not create a genuine issue of material fact. Accordingly, we affirm the district court's grant of summary judgment to NIMA on Webster's breach of contract claim.[1]

IV.

We turn now to Webster's claim that the changes in his work role, his lowered performance ratings, his failure to receive promotion recommendations and bonuses, and his transfer from the night shift to the day shift were the result of race discrimination and retaliation for his prior EEO activity, as well as his claim that the district court erred in refusing to allow him an opportunity to explore these claims through discovery.

---

[1]Webster's claim that NIMA failed to timely pay his attorneys' fees is undisputed. The parties agree that the check was inadvertently sent to Webster instead of his attorney and, therefore, not made within 30 days. NIMA issued a second check to Webster's attorney in March 2002 and, thereafter, Webster returned the money he had erroneously received the previous November. It was also undisputed that Webster suffered no damage as a result of the late payment to counsel. Thus, the district court correctly observed that NIMA's failure to pay the attorneys' fees in a timely manner was not a substantial or material breach of the settlement agreement and that, even if it were, NIMA was entitled to summary judgment because Webster suffered no damages.

15

A.

Webster seeks to establish his claims of race discrimination under the burden-shifting scheme of McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). Under this framework, Webster must first establish a prima facie case of discrimination, i.e., that (1) he "is a member of a protected class"; (2) that he "suffered adverse employment action"; (3) that he "was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment action"; and (4) the adverse employment action occurred under circumstances raising an inference of unlawful discrimination. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc). If established, the burden then shifts to the defendant to come forward with a legitimate, nondiscriminatory reason for the challenged employment decision. See id. If the defendant meets this burden, the onus returns to Webster to demonstrate that the reason is pretextual and that discrimination was the motivating force behind the decision. See id.

Webster's retaliation claim also proceeds under the McDonnell Douglas framework. See Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1228 (4th Cir. 1998). To establish a prima facie case of retaliation, a plaintiff must demonstrate that he "engaged in a protected activity," that his employer "took an adverse employment action against [him]," and that "a causal connection existed

16

between the protected activity and the asserted adverse action." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 650 (4th Cir. 2002) (internal quotation marks omitted).

Here, the district court granted summary judgment because Webster failed to establish any adverse employment action. See James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (noting that "[r]egardless of the route a plaintiff follows in proving a Title VII action, the existence of some adverse employment action is required") (internal citation and footnote omitted). And, the district court concluded that Webster failed to specify sufficiently the need for further discovery on these issues. For the following reasons, we hold that, with the exception of Webster's claim arising from his transfer from the night shift to the day shift, the district court prematurely granted summary judgment to NIMA on Webster's Title VII claims.

B.

"An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment. Conduct short of ultimate employment decisions can constitute adverse employment action." Id. at 375-76 (internal citation, footnote, and quotation marks omitted). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote,

17

reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) (emphasis added).

Thus, a reassignment can "form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect." Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999). However, a mere change in an employee's job assignment, even if "less appealing to the employee, . . . does not constitute adverse employment action." Booz-Allen, 368 F.3d at 376. "Absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." Id. (internal quotation marks and alteration omitted).

As an initial premise, we note that Webster has been afforded no opportunity to conduct discovery into his claims of discrimination and retaliation. The district court granted summary judgment not because Webster had no evidence of discriminatory or retaliatory motives, but because he had failed to allege an adverse employment action as a matter of law. We disagree. In his complaint and affidavit filed in opposition to the motion to dismiss and for summary judgment, Webster asserts that NIMA changed his job from cartographer to geospatial analyst, even though he did

18

not have the skills to perform in this new position, that he thereafter received lower evaluation ratings from his supervisor (a fact that does not appear to be disputed by NIMA) and that, although his evaluations were termed "excellent," his numerical score was insufficient to qualify him for the yearly bonuses and promotion recommendations that he had previously enjoyed. This reassignment and its accompanying financial impact took place shortly after Webster filed EEO complaints alleging race discrimination and retaliation. He further asserts that similarly situated employees were not reclassified and continued to advance in their careers.

Under the circumstances, Webster has alleged adverse employment actions sufficient to at least pursue discovery into his claims. As noted above, a reassignment can "form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect," such as a "decrease in compensation, job title, level of responsibility, or opportunity for promotion." Boone 178 F.3d at 256-57; see also Von Gunton v. Maryland, 243 F.3d 858, 867 (4th Cir. 2001) (noting that "downgrade of a performance evaluation could effect a term, condition, or benefit of employment"). Webster has alleged and presented at least some evidence that the changes in his job and evaluations that occurred in 2002 had a significant detrimental

19

effect upon him because they resulted in his not being recommended for promotions and his being denied bonuses.

NIMA contends that Webster's job changes were the result of internal reorganization and that he was not recommended for a promotion and denied bonuses because he was not an exceptional employee. That may be, but Webster has had no opportunity to conduct discovery on his claims, which could very well matter. For example, Webster argues that he cannot respond to NIMA's position that the bonus was discretionary and that it was denied based upon his job performance, as Webster has been unable to obtain discovery concerning the bonus policy, the reasons underlying the denial of the benefits to him, or the manner in which similarly-situated employees were treated in this regard. Similarly, NIMA argues that it was entitled to summary judgment because Webster was required to point to someone who was similarly situated, outside his protected class, and who was recommended for a promotion. NIMA glosses over the fact, however, that this is precisely the allegation that Webster seeks to establish through discovery.

For similar reasons, we are unpersuaded by NIMA's claim that Webster's Rule 56(f) affidavit was deficient. Webster filed affidavits setting forth the facts upon which he held personal knowledge and filed a certification stating that he needed additional discovery of NIMA personnel to corroborate his claims of discrimination and retaliation. Given the lack of any discovery

20

and the lack of any meaningful opportunity on Webster's part to conduct discovery, we are satisfied that Webster's Rule 56(f) certification,[2] along with his Rule 56(e) affidavit, were sufficient to alert the court of the need for <u>some</u> discovery. <u>Cf.</u> <u>Nguyen</u>, 44 F.3d at 242 (affirming denial of discovery pursuant to Rule 56(f) where plaintiff failed to file any affidavit); <u>Strag</u>, 55 F.3d at 953 (finding affidavit, filed <u>after</u> discovery had been conducted, was insufficient because it made only vague assertions as to the additional discovery sought). In sum, although we express no opinion as to the ultimate merit of Webster's claims (or whether they might ultimately survive summary judgment), we hold that the district court prematurely dismissed Webster's claims that his reassignment, lowered evaluations, and denials of promotion recommendations and bonuses that resulted, were adverse employment actions motivated by discriminatory and retaliatory animus. Accordingly, we remand the case for further discovery.

---

[2]<u>See</u> 28 U.S.C.A. § 1746 (West 1994) ("Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same . . ., such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form: . . . (2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. . . ."").

C.

We affirm, however, the district court's grant of summary judgment to NIMA on Webster's claim is that his transfer from the night shift, which paid better, to the day shift was retaliatory. Although we conclude that the district court erred in ruling that Webster was required to exhaust his administrative remedies before amending his federal complaint to include this additional retaliation claim,[3] we affirm the district court's grant of summary judgment as to the merits of the claim.

Viewing the facts in the light most favorable to Webster, Webster cannot demonstrate a viable claim that the shift change was made with a retaliatory motive. Webster and seventeen other employees were notified that their night shift was being eliminated due to a decreased workload, but were also invited to inform the employer if the transfer to the day shift would create a hardship upon any of them in terms of child care and the like. Webster "did not object to the day shift change because his supervisor made it clear that if he was going to advance, that he needed to accept this change from a night shift to a day shift." J.A. 521.

---

[3]See Nealon v. Stone, 958 F.2d 584, 590 (4th Cir. 1992) (holding that "a separate administrative charge is not [a] prerequisite to a suit complaining about retaliation for filing the first charge" (internal quotation marks omitted)); King v. Seaboard Coast Line R.R. Co., 538 F.2d 581, 583 (4th Cir. 1976) (noting that the scope of a Title VII suit is limited to those discrimination claims stated in the initial EEO charge, claims reasonably related to the original complaint, and claims developed by reasonable investigation of the original complaint).

Accordingly, even if Webster could demonstrate that the loss of his night shift differential occurred and that it was an adverse employment action, he cannot demonstrate that he was singled out and transferred to the day shift in retaliation for his engaging in protected activities. We therefore affirm the district court's grant of summary judgment as to this claim.

V.

For the foregoing reasons, the decision of the district court granting summary judgment to NIMA is hereby affirmed in part, reversed in part, and remanded for further proceedings.

AFFIRMED IN PART, REVERSED
IN PART, AND REMANDED

23

GREGORY, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent from the majority's conclusion that the district court properly granted NIMA's motion for summary judgment on Webster's breach of contract claim regarding his promotion to Pay Band IV and his retaliation claim regarding his lateral transfer, as set forth in Sections III and IV.C, respectively. In my view, discovery into both of those matters was necessary prior to entering summary judgment against Webster. I concur with the majority's opinion in all other respects.

I.

The majority asserts that the terms of the settlement agreement between Webster and NIMA were "quite specific," "clear," and "unambiguous." Op. at 12, 13. The majority thus concludes that the discovery Webster requested regarding his promotion to Pay Band IV was neither relevant nor necessary to resolving his breach of contract claim. Op. at 13. However, I find that discovery was warranted to clarify the meaning of the term "Pay Band 4" prior to entering summary judgment on this claim.

We generally apply commercial contract principles to government contract claims. United Kingdom Ministry of Def. v. Trimble Navigation Ltd., 422 F.3d 165, 172 (4th Cir. 2005) (citing Franconia Assocs. v. United States, 536 U.S. 129, 141 (2002); United States v. Bankers Ins. Co., 245 F.3d 315, 321 (4th Cir.

24

2001)).  For instance, "[i]f the terms of the contract are clear and unambiguous, then we must afford those terms their plain and ordinary meaning; however, if the terms are vague or ambiguous, then we may consider extrinsic evidence to interpret those provisions."  Providence Square Assocs., LLC v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000) (internal citations omitted).  A contract is ambiguous where it is capable "of admitting of two or more meanings, of being understood in more than one way, or of referring to two or more things at the same time."  Nehi Bottling Co. v. All-American Bottling Corp., 8 F.3d 157, 161 (4th Cir. 1993) (internal quotations and citations omitted).

The settlement agreement states that "[t]he agency will promote the complainant to Pay Band 4, retroactive to 6 September 1999 within 30 days of the date that all parties have signed this agreement."  J.A. 134.  However, the term "Pay Band 4" is ambiguous since it potentially refers to more than one GS-level and several steps to which Webster could have been promoted.  Although the record is unclear as to the precise scope of Pay Band IV, Webster's supervisor testified that Pay Band IV was approximately the equivalent of GS-13.  J.A. 309.[1]  Webster has asserted that NIMA

---

[1]According to the 1999 pay table issued by the United States Office of Personnel Management ("OPM"), GS-13, Step 1 establishes an annual base compensation of $53,793, while GS-13, Step 10 establishes an annual base compensation of $69,930.  See http://www.opm.gov/oca/99TABLES/GSannual/fsc/99GSf.htm (last visited Nov. 14, 2005).  GS-14, Step 1 sets forth an annual base compensation of $63,567, while GS-14, Step 10 sets forth an annual

25

promoted him to GS-13, Step 2, which is within Pay Band IV, instead of promoting him to GS-13, Step 5, which could also be within Pay Band IV. J.A. 140.[2] Moreover, the settlement agreement on its face provides no clarification into the precise nature of Webster's promotion. Contrary to what the majority suggests, Webster's breach of contract claim regarding his promotion therefore rests entirely on the ambiguity of the term "Pay Band 4," as it is employed in the settlement agreement, as opposed to terms unincorporated into the agreement.

I find that discovery regarding the intent of the parties was necessary with respect to the term "Pay Band 4" prior to entering summary judgment on Webster's breach of contract claim. Yet the district court denied Webster's Rule 56(f) motion to conduct depositions of NIMA counsel Jack Rickert and EEO Complaints Manager John Sutkowsky regarding the precise GS-level and step contemplated

---

base compensation of $82,638. Id. The official NIMA web site does not provide information regarding Pay Band IV, as it was established in 1999, but states that, as of January 9, 2005, Pay Band IV encompasses an annual base compensation range of $64,478 to $104,133 and is the equivalent of GS-13 through GS-14. http://www.nga.mil/portal/site/nga01/index.jsp?epi-content=GENERIC&itemID=85286150617abf00VgnVCMServer3c02010aRCRD&beanID=1629630080&viewID=Article (last visited Nov. 14, 2005).

[2]According to the 1999 OPM pay table, GS-13, Step 5 yields an annual base compensation of $60,965, while GS-13, Step 2 yields an annual base compensation of $55,586. J.A. 146.
To the extent that Webster further asserts that the parties had agreed to promote him retroactively to GS-14, Step 1 from March 2000, however, this second promotion is not incorporated into the settlement agreement and is therefore barred on the face of the agreement.

for his promotion.  J.A. 98, 536-37.  Accordingly, I conclude that the district court abused its discretion in denying Webster's motion for discovery regarding his promotion, and erred in granting summary judgment on this claim.  See Nguyen v. CNA Corp., 44 F.3d 234, 242 (4th Cir. 1995); Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 245 (4th Cir. 2002).

II.

The majority further acknowledges that Webster's transfer and attendant loss of night pay differential could be considered an adverse employment action for the purposes of his retaliation claim.  Op. at 21.  The majority nevertheless concludes that, even if the transfer constituted an adverse employment action, Webster "cannot demonstrate that he was singled out and transferred to the day shift in retaliation for his engaging in protected activities." Id.  In so doing, the majority relies on Webster's counsel's representation at oral argument on the motion for summary judgment that Webster "did not object to the day shift change because his supervisor made it clear that if he was going to advance, that he needed to accept this change from the night shift to a day shift." J.A. 521.

The majority thus suggests that Webster himself viewed the transfer as a positive change, to the extent that he cannot show pretext.  However, the record reflects that when Webster's first-

27

line supervisor, David Bialek, directly asked him whether he had any concerns regarding the transfer, Webster "gave me the impression that he felt it was mandatory and that he had no choice." J.A. 232. Construed fairly, Webster's failure to object to the transfer reveals his sense of futility regarding the situation, rather than any perceived concurrence with his employer's view that the transfer would enhance his promotion opportunities.

Even assuming that Webster could increase his promotion opportunities by heightened visibility on the day shift, Webster never had the opportunity to demonstrate that this reason was not the true reason for his transfer, but was merely a pretext for retaliation. By ending the analysis with NIMA's proffered reason, the majority skips the third step of the McDonnell Douglas burden-shifting framework, which affords Webster the opportunity to show pretext or other evidence probative of retaliation. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973) (noting that after the employer presents its nondiscriminatory reason for the adverse employment action, the plaintiff "must . . . be afforded a fair opportunity to show that [the employer's] stated reason . . . was in fact pretext"); see also Sutera v. Schering Corp., 73 F.3d 13, 18 (2d Cir. 1995) (summary judgment inappropriate where the plaintiff, who admitted that he engaged in forgery, never had the opportunity to demonstrate that his "forgery of physicians'

signatures was not the true reason he was discharged, but was merely a pretext and that his discharge was motivated by discrimination"); Paquin v. Fed. Nat'l Mortgage Ass'n, 119 F.3d 23, 28 (D.C. Cir. 1997); Kachmar v. SunGard Data Sys. Inc., 109 F.3d 173, 183 (3d Cir. 1997).

Significantly, information regarding the circumstances of Webster's transfer was exclusively in the hands of his employer. Yet NIMA moved for summary judgment prior to the taking of any discovery, thereby precluding Webster from opposing the motion in a meaningful way. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n.5 (1986) (summary judgment inappropriate where "the nonmoving party has not had the opportunity to discover information that is essential to his opposition"); Harrods, 302 F.3d at 246-47 ("'[S]ufficient time for discovery is considered especially important when the relevant facts are exclusively in the control of the opposing party.'") (quoting 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)). Accordingly, I conclude that the district court abused its discretion in denying Webster's motion for discovery regarding his transfer pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, and erred in granting summary judgment on this claim at that juncture. See Nguyen, 44 F.3d at 242; Harrods, 302 F.3d at 245.