Aaron C. JAMES, Plaintiff–Appellant,

v.

BOOZ–ALLEN & HAMILTON, INCORPORATED, Defendant–Appellee.

No. 03–1559.

United States Court of Appeals, Fourth Circuit.

May 14, 2004.

Argued: Feb. 25, 2004.

Decided: May 14, 2004.

**ARGUED:** Peter Charles Cohen, Charlson Bredehoft, P.C., Reston, Virginia, for Appellant. Thomas Peter Gies, Crowell & Moring, Washington, D.C., for Appellee. **ON BRIEF:** Elaine Charlson Bredehoft, Charlson Bredehoft, P.C., Reston, Virginia, for Appellant. Terence F. Flynn, Crowell & Moring, Washington, D.C., for Appellee.

Before WILKINSON, TRAXLER, and SHEDD, Circuit Judges.

Affirmed by published opinion. Judge WILKINSON wrote the opinion, in which Judge TRAXLER and Judge SHEDD joined.

## OPINION

WILKINSON, Circuit Judge:

Aaron C. James appeals the district court's decision to grant summary judgment in a Title VII case to his former employer Booz–Allen & Hamilton, Inc. ("BAH"). This case centers on the reassignment of James from his role as Project Manager for BAH's contract with the Washington Metropolitan Area Transit Authority ("WMATA"). James continued to serve as a BAH Senior Associate, but he was asked to focus on outside marketing and business development opportunities for the company, while continuing to work on the WMATA contract. This role was consistent with preexisting responsibilities and goals that were laid out in his job description and annual evaluations. James continued to perform professional-level work, received a raise and a sizable bonus, and remained on course toward future promotion. We agree with the district court that the reassignment did not satisfy the threshold Title VII requirement of an adverse employment action, and thus affirm the dismissal of the action.

I.

Appellant James is an African American male and an electrical engineer with more than twenty-years experience in urban rail transportation. From October 1988 to May 1994, James worked for the Transportation Practice Group of BAH. In 1994

he voluntarily left BAH. Two years later, he was recruited to return and rehired as a Senior Associate Level IV, a promotion from his previous position. James' job description envisioned his working multiple years as a Senior Associate and assuming a variety of roles.

From 1996 to February, 1999, James served as the Project Manager for BAH's contract with WMATA. Under this contract BAH provided engineering services to prepare for and oversee the procurement of new rail cars for the Metro system. Gary Schulman directly supervised James and served as the BAH Principal in charge of the WMATA project which James managed. Ghassan Salameh, as a BAH Vice–President and the head of the Transportation Group, also oversaw James. During the time that James managed the WMATA project, WMATA's expanding needs caused BAH's contract revenues to grow from approximately $1 million to $10 million annually. James eventually assumed responsibility for supervising a group of twenty-five to thirty employees who worked on the WMATA contract.

James' Title VII complaint focuses on BAH's decision to reassign him in February 1999 and on his subsequent annual performance evaluation. James received mixed evaluations that included both praise and criticism throughout his tenure at BAH. James received a rating of "effective" in his 1996–1997 annual BAH evaluation. This evaluation noted that James needed to improve his personal time management practices and the timeliness of work delivery, to refine his client handling skills, and to build strong relationships with key WMATA officials. James received the highest rating of "excellent" in his 1997–1998 evaluation. But this evaluation noted difficulties in James' relationship with his WMATA counterpart, Ray

Stoezer, which some reviewers attributed to James' being "too administratively focused and rigid." The evaluation directed James to expand his role in developing BAH's transportation practice by cultivating new clients and business opportunities.

During the spring of 1998, BAH's responsibilities under the WMATA contract greatly increased when WMATA contracted with a foreign firm to build a new series of subway cars. Simultaneously, WMATA officials voiced concerns to Salameh about BAH's level of support for the contract. On June 5, 1998, James responded to Salameh's request for input on how to improve BAH's performance by writing a memo that largely attributed BAH's problems to the shortcomings of his counterpart, WMATA's Stoezer. Salameh subsequently met with WMATA's Deputy General Manager and discussed how to resolve WMATA's concerns. On July 30, 1998, Salameh submitted a proposal to WMATA to provide additional staff support, and subsequently hired Richard Trabucco to serve as BAH's direct liaison with Stoezer, so that James could focus on his managerial duties.

In September, 1998, James bypassed established channels of communication with the client and discussed parts of the WMATA contract with a WMATA senior executive without notifying Stoezer or David Tarantino, the WMATA Contracting Officer responsible for the project. Tarantino responded with a letter sharply criticizing James' conduct. James' supervisor Gary Schulman did not fire or reassign James after this incident. Instead, Schulman apologized to WMATA officials for any misunderstandings, and proposed a series of meetings and other measures to avoid future miscommunication.

Over the next several months, Schulman and Salameh continued to receive feedback from WMATA officials and BAH workers

about shortcomings in the technical depth, support, and speed of turnaround of the consulting work that James oversaw. These complaints focused on the failures of an internet-based document control system, delays in laying out an inspection plan for the cars and in lining up qualified personnel for the inspections, and unsatisfactory draft specifications for an overhaul of WMATA cars.

On December 14, 1998, WMATA's Deputy General Manager Chuck Thomas sent a letter to Salameh reiterating that WMATA wanted an organizational structure with a single point of contact. This letter noted that "[t]o date, a major time-consuming problem for the WMATA PM [Stoezer] has been associated with obtaining timely and reliable performance from the BAH engineering support staff. This situation appears to be approaching resolution and the BAH engineering and program support team performance has been improving since the arrival of Mr. Richard Trabucco." The district court made reference to this letter from the client in finding that BAH had a legitimate business purpose in reassigning James.

In January 1999, WMATA and BAH officials discussed a new organizational chart for the WMATA contract in which James would retain a broad coordination and oversight role as "Director of Projects." But BAH's Program Auditor Burt and BAH's liaison to WMATA Trabucco reported to James' supervisors, Salameh and Schulman, that WMATA officials continued to have concerns about both BAH's performance under the contract and BAH's management structure. Given these reports, documented client concerns, and a history of personal difficulties between James and his client counterparts, Schulman and Salameh decided to reassign James.

On February 5, 1999, BAH reorganized the project and hired Karl Berger, a white male, to head the WMATA contract. James was asked to focus on his preexisting marketing and business development objectives to identify and acquire new clients and new opportunities for BAH. During this time James was no longer in a managerial role, but he continued to work as a staff member on parts of the WMATA contract. This allowed James to continue to have billable hours, even while he focused his efforts on cultivating new business opportunities for BAH.

From the time of James' reassignment in February, 1999 to his resignation in July, James remained a Senior Associate Level IV. He received a "highly effective" rating on his next annual evaluation, a five percent salary increase, and a $15,000 bonus. This "highly effective" rating was lower than the "excellent" rating he received the year before, but it was higher than the "effective" rating he received in 1997.

In March 1999, one month after his reassignment, James founded an independent minority contractor business under the name of James Transportation Engineering Consultants. He also applied to a BAH competitor to serve as a full-time subcontractor, a position he eventually accepted immediately prior to his resignation from BAH in July 1999. On March 26, 1999, James filed a charge of race discrimination against BAH with the Equal Employment Opportunity Commission and Prince George's County Human Relations Commission ("PGCHRC"), alleging that he had been treated differently than similarly situated white employees. After an investigation, the PGCHRC dismissed the charge as unsubstantiated.

On October 18, 2000, James filed suit in the district court for the District of Columbia alleging a discriminatory demotion and

a new claim that his April 1999 annual evaluation of "highly effective" was tainted by racial bias. On March 14, 2002, James amended his complaint and dropped the allegations concerning his 1998–1999 performance appraisal. However, James continued to rely extensively on this evaluation in his brief as evidence that he faced adverse employment action. The case was later transferred to the Eastern District of Virginia, and after discovery, briefing, and oral argument, the district court granted BAH's motion for summary judgment.

## II.

The district court found that James had failed to establish a prima facie case of a Title VII or Section 1981 violation. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The court held that James had satisfied three of the four elements of a prima facie case: James was a member of a protected class, was qualified for the position in question, and was replaced by a white individual. But the district court determined that James failed to produce evidence that BAH had taken adverse employment action against him. The court concluded:

> There was no demotion. There was a transfer of responsibilities. The man's salary was not affected. He received his bonus. He still had professional-level work. He was still, if he wanted to be, on track for promotion. There simply is not in this record the adverse action that would satisfy that element.

James challenges this holding and contends that BAH did take adverse employment actions.

We review the district court's grant of summary judgment de novo. *See Higgins v. E.I. DuPont de Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir.1988). And we shall review briefly at the outset the settled principles in our circuit on adverse employment actions. Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual *with respect to his compensation, terms, conditions, or privileges of employment,* because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (emphasis added). Title VII also makes it unlawful for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or *otherwise adversely affect* his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(2) (emphasis added).

Regardless of the route a plaintiff follows in proving a Title VII action, *see Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc),[1] the existence of some adverse employment action is required. This court has set forth clearly what constitutes an adverse employment action. An adverse employment action is a discriminatory act which "adversely affect[s] 'the terms, conditions, or benefits' of the plaintiff's employment." *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir.2001) (quoting *Munday v. Waste Mgmt. of North America, Inc.*, 126 F.3d 239, 243 (4th Cir.1997)).[2] "Conduct short of 'ulti-

---

**1.** James must satisfy the same elements to establish a prima facie case of racial discrimination under either Title VII or 42 U.S.C. § 1981. *See Thompson v. Potomac Electric Power*, 312 F.3d 645, 649 n. 1 (4th Cir.2002);

*Gairola v. Virginia Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir.1985).

**2.** *Von Gunten* entailed the interpretation of the anti-retaliation provision of Title VII, *see*

mate employment decisions' can constitute adverse employment action." *Id.* at 865.

■ The mere fact that a new job assignment is less appealing to the employee, however, does not constitute adverse employment action. *Von Gunten,* 243 F.3d at 868. A "reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect." *Boone v. Goldin,* 178 F.3d 253, 256 (4th Cir.1999). "[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Id.* at 256–57; *see also Taylor v. Virginia Dep't of Corrs.,* 177 F.Supp.2d 497, 504–05 (E.D.Va.2001).

### III.

James alleges a litany of adverse changes to the terms and conditions of his employment that began with his removal as Project Manager for the WMATA contract. These allegations fall into three categories: a claim of denial of opportunities for promotion and professional development, a challenge to James' 1998–1999 performance evaluation, and a claim of constructive discharge.

### A.

■ James asserts that his potential for promotion and professional development was stymied by his reassignment in February 1999 and his subsequent treatment. He claims he was not considered for man-

aging other projects and that because of that he was able to bill less. As a result of this lower billing, he claims that he would have been ineligible for future bonuses and that harassment about his low billing suggested that his job was in jeopardy. He asserts further that he was excluded from important meetings dealing with the WMATA project and excluded from a conference that a similarly situated white male was permitted to attend. James claims he was also denied the opportunity to regain his Project Manager position when his successor was reassigned after a few months. Instead, he alleges that high level BAH managers advised him to "lay low" and that he was never given an explanation for why BAH reassigned him or limited his subsequent opportunities.

It is clear that James found his new role and responsibilities with BAH less appealing, but that fact in and of itself does not constitute adverse employment action. *Von Gunten,* 243 F.3d at 868. The question is whether there was a change in the terms or conditions of his employment which had a "significant detrimental effect" on his opportunities for promotion or professional development. *Boone,* 178 F.3d at 256. We must ask whether there was "a decrease in compensation, job title, level of responsibility, or opportunity for promotion." *Id.* at 256–57.

And it is here that James' case falls short. His lengthy list of complaints does nothing to impeach the district court's holding that he did not suffer an adverse employment action. It was significant to the district court, as it is to us, that James retained his position of Senior Associate

---

42 U.S.C. § 2000e–3, rather than the employment discrimination provision in 42 U.S.C. § 2000e–2 involved in this case. *See Von Gunten,* 243 F.3d at 863 n. 1. However, *Von Gunten's* discussion of what constitutes adverse action applies here as " '[i]n the absence

of strong contrary policy considerations, conformity between the provisions of Title VII is to be preferred.' " *Id.* at 863 n. 1 (quoting *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985)).

and received the same pay, benefits, and other terms and conditions of employment. He even received a five-percent raise after the reassignment and a $15,000 bonus, the largest performance bonus he had ever received with BAH. He was reassigned to cultivate marketing and business development opportunities for BAH, which was a preexisting area of responsibility. And success in this area of responsibility would enhance his future chances for promotion.

James' claim that he was excluded from "important meetings" lacks specificity, and he fails further to substantiate how the alleged exclusions, whatever they might have been, adversely affected him. Similarly, the alleged harassment that James faced about his level of non-billables amounts to nothing more than his being asked to comply with a BAH policy that employees receive approval for high amounts of non-billable hours. Since James' non-billable marketing and business development activities were part of his job description and exactly what his supervisors asked him to do, it is hard to imagine how this could have an adverse effect.

In sum, an employee's dissatisfaction with this or that aspect of work does not mean an employer has committed an actionable adverse action. And speculation about the future adverse consequences of a reassignment may not rise to the level of a genuine dispute. Inasmuch as James departed the company before he even came up for promotion, we are left to guesswork and conjecture as to what his prospects would have been. James' speculations about the impact of his reassignment on his opportunities for professional development are merely that—stark assertions that are not sufficient to survive summary judgment. *See Bryant v. Bell Atlantic Maryland, Inc.,* 288 F.3d 124, 135 (4th Cir.2002).

**B.**

█ James claims that his 1998–1999 annual evaluation, if not an adverse employment action in itself, is nonetheless indicative of the adverse consequences he suffered generally. James argues that BAH deviated from its ordinary practice by having a non-supervisor, Mike Cannell, perform his annual evaluation in 1999. He claims this performance review included false allegations, which led to the lowering of James' performance review from the "excellent" rating that James received the previous year to a "highly effective" rating. James asserts that this lower rating prevented him from being considered for a promotion, in addition to denying him opportunities for bigger bonuses and greater responsibilities.

█ A "downgrade of a performance evaluation *could* effect a term, condition, or benefit of employment" if it has a tangible effect on the terms or conditions of employment. *Von Gunten,* 243 F.3d at 867 (citing *Spears v. Missouri Dep't of Corr. & Human Res.,* 210 F.3d 850, 854 (8th Cir.2000)). However, a poor performance evaluation "is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *Spears,* 210 F.3d at 854. An evaluation merely causing a loss of prestige or status is not actionable. *Cossette v. Minnesota Power & Light,* 188 F.3d 964, 972 (8th Cir.1999).

Here James' rating of "highly effective" was admittedly one level below his previous annual evaluation. Yet it was one level higher than he had received two years earlier. In fact, this latest evaluation was generally positive and consistent with his earlier evaluations, and James received both a pay-raise and a bonus. There is nothing in the record to suggest

that BAH used "the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *Spears*, 210 F.3d at 854. James' claim that this evaluation took him off track for promotion and formed a basis for denying him opportunities is again conjectural. *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818 (4th Cir.1995). James overlooks the fact that, at the time of his 1998–1999 evaluation, BAH was in the midst of a transition to a system in which annual evaluations were conducted by an individual who did not supervise the employee. James also fails to offer any support for his claims that the evaluation involved falsehoods, as opposed to mere disagreements over his performance.

## C.

■ James next alleges that BAH's actions led to irreparable damage to his reputation and that he was subject to constructive discharge. He asserts that Bill Brooks, then a Vice President and Partner at BAH, told James that James' supervisor Ghassan Salameh had expressed critical comments about James in a partners' meeting that discussed promotions and that Brooks suggested that James start looking for another job. Therefore, James claims he was subject to the ultimate adverse action of constructive discharge, which led him to resign on July 31, 1999.

To establish constructive discharge, a plaintiff must be able to show that his former employer "deliberately ma[de] an employee's working conditions intolerable, and thereby force[d] him to quit." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985). "Demotion can constitute a constructive discharge, especially where the demotion is essentially a career-ending action or a harbinger of dismissal." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994). However, mere "[d]issatisfaction

with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Id.* at 459. Even a " 'slight decrease in pay coupled with some loss of supervisory responsibilities,' is insufficient evidence of constructive discharge." *Id.* at 459 (quoting *Jurgens v. EEOC*, 903 F.2d 386, 391–92 (5th Cir.1990)).

We view the alleged statement by then-BAH Partner Bill Brooks about James' lack of prospects for promotion in the light most favorable to James. Even so, the significance of the comment is limited by the fact that it comes from a single BAH partner who had no role in supervising James or in determining his prospects for promotion. This evidence thus falls far short of establishing the existence of "a calculated effort to pressure [James] into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers." *Bristow*, 770 F.2d at 1255. James claims that Brooks' statement, coupled with all of the additional slights he faced, amounted to irreparable damage to his reputation that left him with no choice but to leave. However, the evidence suggests that James enjoyed a number of positive benefits following his reassignment, and he certainly has produced no evidence that he faced the kind of harsh working conditions that would compel any reasonable employee to quit.

## D.

Our holding here is in line with our decisions in *Boone* and *Von Gunten*, which failed to find adverse employment actions in situations where employees faced reassignments, changes in working conditions, and negative performance evaluations. *See Von Gunten*, 243 F.3d at 868; *Boone*, 178 F.3d at 256. It is obvious that Con-

gress in Title VII did not want to tolerate invidious discrimination on the part of companies that merely falls short of the ultimate sanction of dismissal. At the same time, the language of the statute requires the existence of some adverse employment action to establish a Title VII violation. The statute's wording makes clear that Congress did not want the specter of liability to hang over every personnel decision. In awarding summary judgment on this record, the district court properly struck the balance in favor of the employer's need to enjoy some flexibility in matching an employee's tasks to his own talents and the company's business requirements.[3]

### IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

---

**3.** James also argues that race was the motive for his reassignment and the alleged setbacks that he faced. BAH asserts that it reassigned James because of documented problems in the WMATA project which James had overseen as Project Manager and longstanding concerns about his relationship with his WMATA counterparts. The district court did not directly rule on this argument, but noted: "if you are the commander of a group and there's a problem with the group, the commander may be fine, but if the group isn't working out, it's not unreasonable for an employer to reshuffle the whole arrangement." It further stated there was no "smoking gun or any suggestion that the plaintiff's race played any factor in the decisions that [BAH] made about [James'] employment." In the absence of any adverse employment action and the absence of any direct ruling below on this ground, we decline to address this argument as well.