**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 05-1134

MIREYA LYLE; JESSICA CUBAS,

Plaintiffs - Appellants,

versus

COUNTY OF FAIRFAX VIRGINIA,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Claude M. Hilton, District Judge.  (CA-04-519)

Argued:  January 31, 2006          Decided:  March 10, 2006

Before GREGORY, SHEDD, and DUNCAN, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Nils George Peterson, Jr., Arlington, Virginia, for Appellants.  Karen Lee Gibbons, Assistant County Attorney, OFFICE OF THE COUNTY ATTORNEY, Fairfax, Virginia, for Appellee. **ON BRIEF:** David P. Bobzien, County Attorney, Peter D. Andreoli, Jr., Deputy County Attorney, Fairfax, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Appellants Mireya Soledad Lyle and Jessica Cubas (collectively "the plaintiffs") brought this action against their employer, the County of Fairfax, Virginia ("Fairfax County"), alleging sex and national origin discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. In addition, Cubas brought a claim against Fairfax County for failure to pay proper overtime in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. Lyle and Cubas now appeal the district court's grant of summary judgment to Fairfax County on their Title VII and FLSA claims. For the reasons set forth below, we affirm.

I.

We state the facts in the light most favorable to the plaintiffs. Cubas and Lyle, both Hispanic-American females, presently work as civilian employees for Fairfax County. Plaintiff Cubas serves as a Probation Counselor II ("PCII") in the Victim Services Section ("Victim Services") of the Fairfax Police Department, a position that she has held since her hiring in 1998. Plaintiff Lyle joined Victim Services in 2000 as a PCII and worked with Cubas in that capacity until 2003. While Cubas and Lyle both worked for Victim Services, they were under the supervision of Carroll Ann Ellis. Ellis, an African-American female, recommended

the plaintiffs for hire in 1998 and 2000, respectively. Ellis reported directly to Fairfax Police Captain David Sommers, a white male.

A.

In October 2002, while Cubas and Lyle were working together at Victim Services, they were involved in a traffic accident in a county vehicle. Cubas, who was driving, struck a concrete planter barrier, causing damage to the front passenger side of the vehicle. At the time of the accident, plaintiff Lyle was sitting in the front passenger seat. After returning to Police headquarters, Cubas reported the accident (her third in a county vehicle) to Sommers. Instead of relating that she had hit the concrete planter barrier while parking, Cubas told Sommers that the damage had been caused by a hit-and-run driver. J.A. 818. At Sommers's urging, Cubas reiterated this version of events in an official accident report.

Subsequently, Fairfax County Police Lieutenant Richard Bearden conducted an investigation of the accident and concluded that Cubas had struck the planter barrier while parking. J.A. 817-23; 906-07. Accordingly, Bearden found Cubas to be in violation of several of the Department's regulations, including failure to make truthful statements during the course of an investigation. Bearden also concluded that Lyle had been untruthful during the course of his

3

investigation. After an administrative hearing in November 2002, Sommers sustained Bearden's findings and recommended both Cubas's and Lyle's termination. Subsequently, the plaintiffs filed grievances with Fairfax County, alleging that Sommers and Ellis had discriminated against them. J.A. 828-842; 1492-98; 1552-53.

In early 2003, then Fairfax Police Colonel Thomas Manger initiated an investigation of the plaintiffs' discrimination complaints.[1] Ultimately, in March 2003, Colonel Manger concluded that their allegations of gender and national origin discrimination were unfounded. Manger concluded in pertinent part as follows:

> The complaints made by Mrs. Cubas and Ms. Lyle were an attempt to save their own jobs and did not accurately represent the conditions that exist in the Victim Services Section. However, I do believe that there is a personality conflict between Mrs. Ellis and Mrs. Cubas, which both readily admitt [sic]. The cause of this conflict is not known, nor is it relevant. However, I do not believe that this conflict affected Mrs. Ellis' ability to effectively supervise Mrs. Cubas. My investigation has revealed that Mrs. Cubas and Ms. Lyle were not unlawfully discriminated against while employed in the Victim Services Section.

J.A. 936. The plaintiffs contend that these findings are suspect, because the investigator had refused to consider a 1998 departmental investigation regarding Ellis's contentious relationship with a co-worker.[2] The investigator testified at his

---

[1] Manger is now Chief of Police.

[2] In October 1997, the Department investigated Victim Services employee Cornelia Harrington's allegations against Ellis regarding her management style. The Department concluded that the problems

4

deposition that he did not consider the 1998 investigation because he wanted to remain impartial in considering Cubas and Lyle's unrelated discrimination charges. J.A. 1159.

At the same time Colonel Manger was investigating the plaintiffs' charges of discrimination, Deputy Police Chief David Rohrer conducted an independent review of the accident investigation findings and Sommers's disciplinary sanctions against Cubas and Lyle. As to Lyle, Rohrer concluded that the lack of truthfulness finding was "Not Sustained." J.A. 856. Deputy Chief Rohrer emphasized that although he ultimately reached a different conclusion than Sommers had, he found that Sommers's conclusions regarding Lyle's truthfulness were "reasonable" given Lyle's initial "vague" and "incomplete" statements regarding her recollection of the accident. J.A. 857. Accordingly, Manger concluded that Lyle would not be reprimanded or sanctioned for her involvement. As to Cubas, Rohrer sustained Sommers's finding that Cubas had violated regulations pertaining to the safe operation of county vehicles, but concluded that the lack of truthfulness allegation was "Not Sustained." J.A. 849-62. Pursuant to

---

between Ellis and Harrington were the result of personality conflicts. Thereafter, Harrington was transferred to the Animal Control Division. In September 1998, Harrington complained that Ellis had made derogatory and demeaning comments about her sexual preferences in violation of Department regulations. After conducting a second and more extensive investigation and substantiating Harrington's charges, the Department suspended Ellis for twenty-four hours and issued her a written reprimand for unbecoming conduct.

5

departmental policy, Rohrer issued Cubas a written reprimand for her third accident in a county vehicle. No other disciplinary action was taken.

B.

In April 2003, shortly after Manger and Rohrer had completed their investigations, the Fairfax County Executive implemented a County-wide reduction-in-force plan ("RIF") in accordance with the fiscal year 2004 budget. This RIF led to the elimination of thirty occupied merit positions throughout the County, including Lyle's position at Victim Services. The facts pertaining to the RIF are outlined below.

In July 2002, several months prior to the accident and the lodging of discrimination complaints, Fairfax County's Director of Management and Budget mandated that each County agency identify workforce reductions of five percent as part of its fiscal year 2004 budget requests.[3] Accordingly, in September 2002, the Fairfax Police Department submitted its anticipated fiscal year 2004 budget, which identified sixty-nine positions that could be eliminated. Of these sixty-nine positions, twenty were occupied, including one PCII position at Victim Services. The remaining

---

[3]The fiscal year 2004 budget was scheduled to be adopted in the spring of 2003.

6

forty-nine positions identified for possible elimination were vacant.

Subsequently, in April 2003, the Fairfax County Executive implemented the County-wide RIF in accordance with the recently-approved fiscal year 2004 budget. The final version of the RIF called for the elimination of thirty occupied merit positions in various County agencies. The County's Department of Human Resources ("HR") implemented the RIF according to County regulations. Specifically, HR ranked employees in each of the affected agencies in the order of seniority. J.A. 699-701. HR determined that it would first eliminate the positions of the least senior employees in the affected divisions.

In May 2003, the County's Director of HR informed Lyle that "[b]ased on [her] agency, class, and seniority" Fairfax County was eliminating her position with the Victim Services. J.A. 725. However, HR offered Lyle a lateral position as a Social Worker II in the Department of Systems Management for Human Services ("Systems Management"). HR had determined that this lateral position was commensurate with Lyle's educational background and previous work experience. Lyle accepted the Social Worker II position with Systems Management in June 2003. J.A. 745. As a result of this lateral transfer, Lyle maintained her previous pay grade of S-22 and later received a pay bonus for her performance in 2003. Cubas also received a pay bonus for 2003.

7

C.

Subsequently, the plaintiffs filed complaints with the Equal Employment Opportunity Commission ("EEOC") alleging national origin and gender discrimination. The EEOC denied their complaints, and issued the plaintiffs right-to-sue letters. Thereafter, in May 2004, the plaintiffs filed a four-count complaint in the United States District Court for the Eastern District of Virginia, alleging discrimination on the basis of national origin; discrimination on the basis of sex; retaliation; and failure to pay overtime in violation of the FLSA. J.A. 11-15. Concluding that the plaintiffs had failed to produce evidence that the defendant had taken an adverse employment action against them, the district court granted summary judgment to the defendant on Counts One, Two, and Three. The district court also granted the defendant summary judgment on the overtime claim, finding that Cubas had failed to produce any evidence of the defendant's failure to compensate her for earned overtime.

II.

The plaintiffs raise three issues on appeal. First, Cubas and Lyle assert that the district court erred in granting summary judgment to Fairfax County on their sex and national origin discrimination claims. Second, the plaintiffs contend that the court erred in granting summary judgment on their retaliation

8

claim. Third, plaintiff Cubas asserts that the district court erred in granting summary judgment to the defendant on her overtime claim. We address each of these assignments of error in turn.

A.

The district court appropriately granted summary judgment to the defendant on the plaintiffs' sex and national origin discrimination claims. This court reviews de novo an award of summary judgment, viewing the facts and inferences drawn therefrom in the light most favorable to the non-moving party. See Seabulk Offshore, Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 418 (4th Cir. 2004). Ultimately, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Title VII makes it "an unlawful employment practice for an employer . . . to discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful for an employer "to limit, segregate, or classify his employees or

9

applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(2).

A plaintiff may establish a claim for sex or national origin discrimination via two avenues of proof.  Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284-85 (4th Cir. 2004) (en banc).  "First a plaintiff may establish a claim of discrimination by demonstrating through direct or circumstantial evidence that sex . . . [or national origin] discrimination motivated the employer's adverse employment decision."  Id. at 284.  The plaintiff "need not demonstrate that the prohibited characteristic was the sole motivating factor to prevail, so long as it was a motivating factor."  Id.  More commonly, a plaintiff will attempt to establish a discrimination claim by way of the burden-shifting framework provided by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under McDonnell Douglas, the plaintiff attempts to demonstrate, by way of circumstantial evidence, that the employer's proffered reason for the challenged employment decision is pretext for discrimination.

10

The plaintiffs asserted at oral argument that direct evidence supports their claims of sex and national origin discrimination.[4] In the alternative, the plaintiffs argue that they can prove discrimination through circumstantial evidence using the McDonnell Douglas test. However, regardless of the method the plaintiffs employ to prove discrimination under Title VII, they must also prove "the existence of some adverse employment action[.]" James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (internal citation omitted). Accordingly, before we consider whether the plaintiffs have established a prima facie case of discrimination under McDonnell Douglas, we address the more preliminary question of whether they suffered an adverse employment action. We conclude that they did not.

"An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment." James, 368 F.3d at 376 (internal quotation omitted). It is well-settled that unlawfully motivated ultimate employment decisions--hiring, discharging, refusing to promote, etc.-- constitute adverse employment actions, because they have a direct impact on the terms, conditions, and benefits of employment. However, discriminatory conduct can sometimes

_____

[4]Because there is no direct evidence in the record that the plaintiffs' supervisors made employment decisions because they were motivated--solely, or in part--by gender or racial animus, this contention is dubious.

11

constitute an adverse employment action, even where the plaintiff is not affected by an ultimate employment decision. Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001). For discriminatory conduct that falls short of an ultimate employment decision to qualify as such, that conduct must detrimentally impact the material terms of the plaintiff's present employment or her prospect for advancement. See James, 368 F.3d at 375.

It must also be remembered that the "terms, conditions, or benefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment policies or exemption from [an employer's] disciplinary procedures." Von Gunten, 243 F.3d at 869. Further, an employer's act of transferring an employee to a lateral position or assigning her less appealing work does not constitute an adverse employment action. See James, 368 F.3d at 376-77. Indeed, "[a]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." Id. at 376.

In this case, there is no allegation of an ultimate employment decision. The plaintiffs, however, allege a litany of adverse changes to the terms and conditions of their employment, which they contend resulted from the defendant's discriminatory animus.

12

First, Cubas and Lyle contend that Ellis assigned them heavier caseloads than similarly situated PCII employees in Victim Services. Second, Cubas asserts that Ellis denied her certain training opportunities that she offered to non-Hispanic employees. Third, Lyle points to the elimination of her PCII position and subsequent transfer to another division. Fourth, the plaintiffs contend that the defendant prohibited them from working overtime, while allowing three of the ten employees in their section to work overtime. Finally, the plaintiffs assert that the defendants' investigation of the car accident involving the plaintiffs was conducted in a discriminatory manner.

The above allegations do not rise to the level of adverse employment actions under our recent decision in James. In that case, the plaintiff, an African-American electrical engineer, brought a discrimination suit against his employer after the employer reassigned him to a different project. 368 F.3d at 373-74. The year after his reassignment, James received a "highly effective" rating on his annual evaluation, a five percent salary increase, and a $15,000 bonus. Id. Nevertheless, the plaintiff alleged that the reassignment was motivated by discriminatory animus and that as a result, he had suffered several adverse employment actions. Among other allegations not relevant here, James asserted that the reassignment stymied his opportunity for promotion and development because he was not able to bill as many

13

hours as he had on the previous project.  Id.  Further, James alleged that his employer had prevented him from attending a training seminar that it had allowed a similarly situated white employee to attend.  Finally, James contended that his employer denied him the opportunity to reapply for his previous position after his successor was reassigned.  Id.

In assessing whether the above allegations constituted an adverse employment action, the court in James recognized that the determinative question was "whether there was a change in the terms or conditions of [James's] employment which had a significant detrimental effect on his opportunities for promotion or professional development."  Id. at 376.  Further, the court concluded that only a "decrease in compensation, job title, level of responsibility, or opportunity for promotion[]" would constitute such a detrimental effect.  Id.  Turning to James's specific allegations, the court held that none of them constituted adverse employment actions.  Id.  Central to this holding was the court's conclusion that even though James's employer had reassigned him to a more mundane project and potentially had lessened his chances for development and promotion, "James [had] retained his position of Senior Associate and received the same pay, benefits, and other terms and conditions of employment."  Id. at 377.  The court concluded that "an employee's dissatisfaction with this or that aspect of work does not mean an employer has committed an

14

actionable adverse action. And speculation about the future adverse consequences of a reassignment may not rise to the level of a genuine dispute." Id.

The plaintiffs' allegations of increased workloads and denial of training opportunities is conjectural, because Cubas and Lyle have put forth no evidence demonstrating that their caseloads were heavier relative to the caseloads of their co-workers in Victim Services. However, even if we are to assume that the plaintiffs had heavier caseloads, this allegation does not constitute an adverse employment action because there is simply no evidence that the plaintiffs suffered a decrease in compensation, job title, level of responsibility, or opportunity for promotion. James, 368 F.3d at 376-77. The plaintiffs' contention that Ellis and Sommers denied them the opportunity to work for overtime fails for the same reason. Although a denial of overtime opportunities could potentially inhibit an employee's opportunities for promotion and professional development and thereby affect her compensation, this did not occur here. Even without additional overtime opportunities, both plaintiffs have continued to progress, without interruption, in terms of their salaries, pay grades, and promotions.

The record also belies the plaintiffs' allegation that the defendant terminated Lyle from her position at Victim Services. Indeed, the undisputed evidence indicates that as a result of a

15

County-wide RIF, the defendant, with Lyle's authorization, transferred her to the <u>lateral</u> <u>position</u> of Social Worker II in Systems Management. This lateral position was commensurate with Lyle's education and previous experience, and, as a result of the transfer, Lyle maintained her previous pay grade and later received a raise. As this court made clear in <u>James</u>, "Absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." <u>Id.</u> at 376. Accordingly, Lyle's transfer does not constitute an adverse employment action.

Finally, the plaintiffs allege that the defendant conducted the accident investigation in a discriminatory manner. As this court held in <u>Von Gunten</u>, the terms, conditions, or benefits of employment do not include immunity from the application of basic, generally applicable employment policies, including routine investigatory and disciplinary procedures. 243 F.3d at 866. The plaintiffs do not dispute that the Department routinely investigates accidents involving County vehicles. Further, although plaintiff Cubas ultimately received a written reprimand for her involvement in the accident (it being her third in a County vehicle), Cubas conceded that it was warranted given her poor driving history. <u>See</u> J.A. 183-85. Thus, to the extent that the

16

accident investigation and subsequent reprimand were conducted pursuant to routine practice and procedure, neither act constitutes an adverse employment action.  See id.

Because the five allegations cited by the plaintiffs in support of their sexual and national origin discrimination claims do not rise to the level of adverse employment actions, we affirm the district court's grant of summary judgment to the defendant on those claims.

B.

The plaintiffs' retaliation claim also fails because the plaintiffs did not suffer an adverse employment action.  To establish a prima facie case of retaliation, an employee must show (1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that a causal connection exists between the protected activity and the adverse employment action.  Hill, 354 F.3d at 298.

We will assume that the plaintiffs engaged in the protected activity of lodging complaints of discrimination against Ellis and Sommers at or about the time of the accident investigation.[5] Afterwards, the plaintiffs allege that the defendants retaliated against them in a number of ways.  First, the plaintiffs contend

---

[5]The defendant disputes the fact that the plaintiffs lodged their discrimination complaints as early as the fall of 2002.

17

that the defendants retaliated by subjecting them to an overly vigorous accident investigation, which included invasive and lengthy polygraph examinations. Second, Lyle contends that she was transferred to Systems Management in retaliation for lodging her complaint, not because of an overall RIF. Third, the plaintiffs assert that the defendants retaliated against them by not assigning them additional cases while the accident investigation was ongoing. Finally, Lyle contends that Ellis gave her an inaccurate evaluation that resulted in a "substandard raise."

These allegations do not rise to the level of adverse employment actions. As explained above, the terms, conditions, or benefits of employment do not include immunity from routine investigatory and disciplinary procedures. See Von Gunten, 243 F.3d at 866. Accordingly, the accident investigation, which was carried out in a routine manner, does not constitute an adverse employment action. The Police Department routinely utilizes polygraph examinations during internal investigations, and, accordingly, the polygraph examinations do not constitute adverse employment actions. Moreover, it should be noted that Lyle, herself, complained on two occasions prior to her polygraph that she had not been afforded the opportunity of a polygraph to clear her name. Thus, as the defendant aptly notes, it is disingenuous

for her now to complain that the subsequent polygraph examination was retaliatory.

Lyle next asserts that while the Department was still investigating her discrimination complaint against Sommers and Ellis, Sommers took action to prevent her from regaining her position with Victim Services. The facts belie this contention. As a result of the passage of the County's fiscal year 2004 budget, HR implemented a County-wide RIF and undertook to eliminate numerous positions in several departments. Because Lyle was the least senior PCII at Victim Services, HR designated her position for elimination. However, HR offered, and Lyle accepted, a voluntary transfer to a lateral position as a Social Worker II at the same pay grade and level of seniority. Again, because this lateral transfer did not affect the terms, benefits, or conditions of her employment, it did not constitute an adverse employment action sufficient to support a retaliation claim.

The plaintiffs next contend that Ellis did not assign them any new cases during the pendency of the accident investigation and that Ellis under-reported the number of cases Lyle handled in 2003. As a result, the plaintiffs assert that they each received a "substandard raise." Even if Ellis did not assign them new cases during the investigation, this action was entirely appropriate given that the investigation might have led to the termination of these employees for false statements regarding the accident.

19

Lyle's contention that Ellis gave her a "bad evaluation" for a portion of 2003, causing her to receive a pay increase that was $400 less than it otherwise would have been, is conjectural. To the contrary, the record indicates that Ellis gave Lyle a higher performance rating for that part of 2003 when she still worked for her at Victim Services than Lyle's new supervisor at Systems Management gave her for the remainder of 2003. J.A. 325-26; 699-701. Based partly on Ellis's higher rating, Lyle received a three percent pay increase in 2004. Thus, Lyle suffered no detriment to the terms and conditions of her employment because of Ellis's evaluation.

In sum, the overwhelming evidence indicates that the plaintiffs did not suffer any decrease in compensation, job title, level of responsibility, or opportunity for promotion as the result of their respective caseloads or annual performance evaluations. Accordingly, these factual allegations--even accepting them as true--do not constitute adverse employment actions and cannot sustain a retaliation claim under Title VII. Therefore, we affirm the district court's grant of summary judgment to the defendant on the plaintiffs's retaliation claim.

C.

Although the plaintiffs asserted "hostile work environment" as a fourth issue in their Docketing Statement, they did not list this

20

claim as a separate issue presented on appeal in their opening brief. Further, the plaintiffs did not identify or discuss the relevant legal standard for a formal hostile work environment claim or apply the facts thereto. Indeed, as the defendant points out, the phrase "hostile work environment" does not appear anywhere in the plaintiffs's opening brief. Nevertheless, the plaintiffs allege several hostile acts in their brief in support of their more general claim of sex and national origin discrimination. First, plaintiff Cubas asserts that on one occasion, Ellis once referred to her as "Mexican," when, in fact, she is Columbian. On two other occasions, Cubas alleges that Ellis stated that Cubas's "people are very colorful." Cubas also contends that Ellis made derogatory remarks about Cubas having a baby, and treated her more harshly after she returned from maternity leave. Plaintiff Lyle contends that Sommers made derogatory remarks about her gender. Specifically, Lyle contends that when she mentioned to Sommers that she had not received the computer equipment she had requested, Sommers responded: "I won't be the last man to lie to you." App.'s Br. at 7. Finally, Cubas and Lyle contend that Ellis did not allow them to attend departmental meetings together.

Although the plaintiffs make several factual allegations of hostile treatment in asserting their more general sex and national origin discrimination claims, they waived consideration of a formal hostile work environment claim by not asserting one in their

opening brief. Federal Rule of Appellate Procedure 28(a)(5) requires that an appellate brief contain "a statement of the issues presented for review." Further, Rule 28(a)(7) requires that a brief contain "a statement of the facts relevant to the issues submitted for review with appropriate references to the record." To the extent that the plaintiffs elected not to assert and explain the basis for a formal hostile work environment claim in their brief, they waived consideration of this issue on appeal.[6] See 11126 Baltimore Blvd. v. Prince George's County, 58 F.3d 988, 993 n.7 (4th Cir. 1995).

D.

Finally, plaintiff Cubas asserts a claim under the FLSA, alleging that she worked overtime hours during her lunch breaks for which she was never paid. The FLSA establishes a forty-hour

---

[6]Even if we were to consider a separate hostile work environment claim based on Ellis's derogatory remarks and more hostile treatment towards Cubas after her return from maternity leave, this conduct was not "severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive[.]" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). The same can be said with respect to Sommers's allegedly derogatory remark to plaintiff Lyle. In sum, the isolated and infrequent conduct complained of by the plaintiffs, although arguably offensive, is more akin to the kind of rude and insensitive behavior that we have held is not sufficiently severe or pervasive to constitute a hostile work environment under Title VII. See, e.g., Hartsell v. Duplex Prods., 123 F.3d 766, 773 (4th Cir. 1997) (holding that comments about plaintiff's appearance and remarks generally demeaning to women were not sufficiently severe or pervasive).

workweek for covered employees and mandates compensation at time-and-a-half for those weekly hours in excess of forty.  29 U.S.C. § 207(a).  An employee must perform forty hours of actual work in a seven-day period before she is entitled to overtime.  Id.  To establish a claim for unpaid overtime wages under the FLSA, the plaintiff must establish by a preponderance of the evidence (1) that she worked overtime hours without compensation; and (2) that the employer knew (or should have known) that she had worked overtime but did not compensate her for it.  Davis v. Food Lion, 792 F.2d 1274, 1276 (4th Cir. 1986).

Although Cubas claims that she is entitled to overtime for working through lunch on fourteen separate occasions from 2002 to 2004, the record indicates otherwise.  According to Cubas's time and attendance sheets, she reported and was paid for three-and-a-half hours of overtime for November 14, 2002, the first date for which she now claims overtime.  J.A. 956.  With respect to seven other occasions, Cubas did not work a required forty-hour workweek.[7]  Id.  As to the remaining six occasions when Cubas alleges to have worked overtime during her lunch break, the evidence indicates that the plaintiff never sought prior authorization for this work or submitted overtime vouchers after it was completed.  Thus, even if the defendant worked overtime on

_____

[7]For three of these occasions, Cubas reported several hours of sick or annual leave, or a combination of both.

these occasions, the defendant is not liable under the FSLA because it did not have knowledge that Cubas had worked overtime on those occasions.  See Davis, 792 F.2d at 1276.  Accordingly, the district court properly granted summary judgment as to the FLSA claim.

## III.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED